**COLUMBIA BRIARGATE COMPANY, a limited Partnership, Appellant,**

v.

**FIRST NATIONAL BANK IN DALLAS; Vaughn Pearson and A.S. Kyzer, Jr., Appellees.**

No. 82–2054.

United States Court of Appeals, Fourth Circuit.

Argued April 13, 1983.

Decided Aug. 10, 1983.

Cynthia Hall Ouzts, Camden, S.C. (T. Alexander Beard, Cooper, Bowen, Beard & Smoot, Camden, S.C., on brief), for appellant.

A. Erin Dwyer, Dallas, Tex. (Ernest E. Figari, Jr., Johnson & Swanson, Dallas, Tex., William L. Pope, Robert C. Kelly, Robinson, McFadden, Moore, Pope, Williams, Taylor & Brailsford, P.A., Columbia, S.C., on brief), for appellees.

Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and JAMES C. FOX, United States District Judge for the Eastern District of North Carolina, sitting by designation.

DONALD RUSSELL, Circuit Judge:

This is an action to recover for alleged fraudulent representations in the negotiations of a contract of sale of a group of fourteen (14) apartment buildings containing three hundred, thirty-six (336) apartment units, known as the Briargate Apartments in Columbia, South Carolina. As filed in the district court of South Carolina it asserted federal diversity jurisdiction. The plaintiff purchaser is a limited partnership organized and existing under the laws of the State of California with its principal place of business in that State. The defendants are the First National Bank In Dallas, a national banking association with its principal place of business in the State of Texas, its vice-president, individually, a resident of Texas (Pearson), and an engineer employed by the Bank, a resident of South Carolina (Kyzer), who had given, allegedly at the instance of Pearson, a certificate to the plaintiff on behalf of the bank "that the apartments were in proper repair, that all deferred maintenance had been performed, and that corrective repairs had been accomplished with respect to the water seepage problem and no further problems were anticipated."

The defendant Bank and its vice-president Pearson, both of whom had been served under the South Carolina long arm statute,[1] joined in a motion to dismiss the action against them on jurisdictional grounds. There is no issue made of the amenability to suit of the defendant engineer in the district court and the sole ground of appeal raised concerns the amenability of the Bank and its vice-president, the defendant Pearson, to jurisdiction herein. In their initial motion, the joint contention of the Bank and its vice-president Pearson, was, so far as the Bank itself was

---

1. S.C.Code § 36–2–803 (1976). Rule 4(e), Fed. R.Civ.P. authorizes a federal district court seeking to reach a party not found within the territory of the state within which the court is held and not amenable to suit under either federal statutes authorizing extra-territorial service or the bulge process provision of Rule 4(f) to borrow the long-arm authority of the state within which the federal court sits.

concerned, that "the sole venue of this action against the Bank is the Dallas Division and, as a result, the United States District Court for the District of South Carolina, Columbia Division, is an improper venue" for this action. It rests this contention on § 94, 12 U.S.C.[2] As to the individual defendant Pearson, their claim was that he had "acted solely in a representative capacity on behalf of the Bank in all his contacts with the State of South Carolina," and that, under those circumstances, "the assertion of jurisdiction over [his] person ... would be contrary to the Fourteenth Amendment." The motion, also, raised the contention that Pearson had a "derivative" immunity under § 94, 12 U.S.C. as a national bank officer acting in his agency capacity against suit in any venue other than the Division of Dallas. Certain affidavits pro and con were filed with the district court in connection with this motion.

After a hearing, the district court granted the motion to dismiss on behalf both of the Bank and of Pearson. It sustained the Bank's claim under § 94, 12 U.S.C. and that of Pearson under what it declared is the controlling "fiduciary shield" doctrine. The plaintiff has appealed the dismissal of the action against Pearson but does not contest the dismissal of the Bank as a defendant.

We reverse.

## I

The plaintiff's complaint alleged that, in the course of negotiating the sale of the Briargate Apartments by the Bank to the plaintiff, the defendant Pearson either made, or induced others to make, a number of false and fraudulent representations about the conditions of the apartments, representations on which the plaintiff had a right to rely in contracting to buy the apartments, and that, as a result of such misrepresentations, it (the plaintiff) sus-

tained substantial damages. For purposes of the motion, these allegations must be assumed to be true. Also for purposes of the motion, it appears to have been agreed at the hearing (1) that the subject-matter or res of the contract negotiation was real estate located in Columbia, South Carolina, owned at the time by the Bank, (2) that all the negotiations for the purchase and sale of such real property between the purchaser and seller were carried out and the contract resulting from such negotiations was executed by both parties thereto in Columbia, South Carolina, (3) that the individual defendant Pearson was at all times the agent of the Bank in negotiating such sale and in furnishing the various certificates and representations required under the terms of the sale and that he executed on the Bank's behalf the deed to the purchaser, and (4) that all such activities of the defendant Pearson occurred in Columbia, South Carolina, over a period of several days.

## II

The principle appears settled that a federal action for fraud or misrepresentation in the diversity jurisdiction is governed by the substantive law of the state where the fraudulent action took place. § 148, Second Conflict of Laws (1971). In this case, the controlling law would accordingly be that of South Carolina. *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir. 1978). Under the law of that jurisdiction, "[a]n agent's liability for his own tortious acts [in such an action is plain and] is unaffected by the fact that he acted in his representative capacity." *Lawlor v. Scheper,* 232 S.C. 94, 98–99, 101 S.E.2d 269, 271 (1957). That principle was recently applied in another South Carolina case similar factually to this case. A corporation and its president were sued for fraudulent representations allegedly made by the president in negotiating a sale of a business to the

**2.** 12 U.S.C. § 94 provides:

"Any action or proceeding against a national banking association for which the Federal Deposit Insurance Corporation had been appointed receiver, or against the Federal Deposit Insurance Corporation as receiver of such association, shall be brought in the district or territorial court of the United States held within the district in which that association's principal place of business is located, or, in the event any State, county, or municipal court has jurisdiction over such an action or proceeding, in such court in the county or city in which that association's principal place of business is located."

plaintiffs. The officer-defendant "moved for a directed verdict on the ground there was no evidence he acted in his individual capacity." The motion was denied and the Supreme Court of South Carolina affirmed, quoting the language of *Lawlor, supra. Gilbert v. Mid-South Machinery Co., Inc.,* 267 S.C. 211, 221, 227 S.E.2d 189, 193 (1976).

This South Carolina rule on the liability of the agent for torts committed in his fiduciary capacity either in a suit against him individually or in a joint suit against him and his principal, is similar to that in other jurisdictions, provided the alleged tort was committed or participated in by the agent. *See Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1144 (4th Cir.1975); *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir.1980); *Donsco, Inc. v. Casper Corp., supra,* 587 F.2d at 606; *A & M Records, Inc. v. M.V.C. Dist. Corp.,* 574 F.2d 312, 315 (6th Cir.1978); *Zubik v. Zubik,* 384 F.2d 267, 275–6 (3d Cir.), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); 3A Fletcher, Cyclopedia of the Law of Private Corporations § 1135, at 202, 203 (1975); and Restatement (Second) of Agency § 343 (1957). Of course, "[i]f [an officer] does not personally participate in the corporation's tort, general corporation law does not subject him to liability simply by virtue of his office." *Tillman v. Wheaton-Haven Recreation Ass'n, Inc., supra,* 517 F.2d at 1144; *Monsen v. Consol. Dressed Beef Co., Inc.,* 579 F.2d 793, 804 (3d Cir.1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323.

We do not understand the defendants to question this South Carolina rule with respect to the substantive liability of an agent or officer for tortious conduct committed by him whether he was acting solely for the benefit of his employer or for his personal benefit. It is, however, their argument that the substantive liability of a non-resi-dent agent-defendant such as the defendant Pearson and his amenability to jurisdiction claimed under a service pursuant to a state long-arm statute, are questions subject to entirely different, even contradictory, rules, and that Pearson, who was at all times acting in his capacity as an officer of the Bank in the matters involved in this suit and a non-resident of South Carolina, is entitled to immunity under what is known as the "fiduciary shield" doctrine from valid service of process under the South Carolina long-arm statute for an alleged tort committed by him in South Carolina, even though concededly he is substantively liable for his participation in the tort. Such doctrine constitutes the defendant's asserted ground for quashing the service herein on him and for dismissing the action against him. The validity of this claim is the single issue in this appeal.

### III

This doctrine of "fiduciary shield," as invoked by Pearson, emerged "with little notice and with no critical examination"[3] as a novel principle by way of dicta in a series of decisions of the New York state and federal courts in the mid-sixties just as a more liberal and relaxed rule was developing in federal courts in favor of the application of state long-arm statutes themselves.[4] Its source is generally identified as a dictum in *Boas & Associates v. Vernier,* 22 A.D.2d 561, 563, 257 N.Y.S.2d 487, 490 (1st Dep't. 1965). The first identification of the doctrine in the New York federal courts was in *United States v. Montreal Trust Company,* 358 F.2d 239 (2d Cir.1966), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440. "[U]nder the 'fiduciary shield' doctrine,"[5] as it has generally been phrased, "the acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally do not form the predicate for jurisdiction over him

---

**3.** *See* Sponsler, *Jurisdiction Over the Corporate Agent: The Fiduciary Shield,* 35 Wash. & Lee L.Rev. 349, 350 (1978). The development of the doctrine is thoroughly canvassed in this article.

**4.** The reason for this relaxation was stated in *McGee v. International Life Ins. Co.,* 355 U.S.

220, 222–23, 78 S.Ct. 199, 200–01, 2 L.Ed.2d 223 (1957), and reiterated in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292–93, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980).

**5.** It is said that *Montreal Trust* first coined the term "fiduciary shield." 358 F.2d at 243.

in his individual capacity." *Bulova Watch Co. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1347 (E.D.N.Y.1981). The court in Montreal Trust, though was careful to point out that in being asked to accept and apply the doctrine, it was not being "presented with a constitutional issue but with a narrow question of statutory interpretation," *i.e.,* of the New York long-arm statute. It emphasized, in discussing the state statute, that New York had not "sought to obtain [under its long-arm statute] full *in personam* jurisdiction over non-domiciliaries who transact business within its boundaries." [6] In neither *Boas* nor *Montreal Trust* did the court elaborate on the doctrine or attempt to offer any logical rationale for it other than as a simple construction of the restricted New York long-arm statute.[7] It was under these circumstances and thus as an incident of the construction of the New York long-arm statute itself (which was not intended to go to the outer limits of due process) and not as an enunciation of any carefully analyzed and reasoned constitutional principle that the court both in *Boas* and *Montreal Trust* made its statements with respect to the "fiduciary shield" doctrine.

That concept as expressed in both *Boas* and *Montreal Trust* that the "fiduciary shield" doctrine is simply an incident of statutory construction and not a constitutional principle has been restated and, to some extent, enlarged upon in the latest exposition of the doctrine by the Second Circuit in *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899 (2d Cir.1981).[8] In this case the court declared: "The fiduciary shield doctrine is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the long arm statute." The court went further and characterized the doctrine not precisely as a matter of statutory construction but rather as an "equitable doctrine" under the statute which was not to be applied inflexibly or "mechanically"[9] but rather to be applied by the court with "a sound exercise of discretion" in order to achieve the ultimate purpose of "fairness" arising out of an "analysis of the particular facts of the case."[10] It proceeded in this vein to declare, that if there was a basis for treating the corporate principal as an "empty shell," the "fiduciary shield" could be disregarded much the same as in other contexts the corporate veil is disregarded or, to use the technical jargon, "pierced," though under more liberal rules than those which governed the "piercing" of the corporate veil in the usual case. *See Holfield v. Power Chemical Company, Inc.,* 382 F.Supp. 388, 394 (D.Md.1974)[11] and *Puerto Rico Mari-*

---

**6.** 358 F.2d at 242. *See also Guccione v. Guccione,* 100 Misc.2d 212, 417 N.Y.S.2d 633, 636 (1979).

**7.** The rule of the Second Circuit is that "the amenability of a foreign corporation [or other non-resident] to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir.1963). The rule in this circuit is the same: *Haynes v. James H. Carr, Inc.,* 427 F.2d 700, 703 (4th Cir.1970), *cert. denied,* 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245. Under this rule, a court only reaches the constitutional issue of the enforcement of state long-arm statute if it has already found enforcement authorized under the state statute.

**8.** *See, also, Laufer v. Ostrow,* 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982).

**9.** This concept of the doctrine as an "equitable" principle had earlier been suggested by Judge Weinstein in *Bulova Watch Co. v. Inc. v. K. Hattori & Co., Ltd., supra,* 508 F.Supp. at 1348:
"As the term 'fiduciary shield' suggests, this is an equitable doctrine. It should be followed not with mechanically but with a sound exercise of discretion."

**10.** 664 F.2d at 902, n. 3 and at 903.

**11.** A recent decision in *State ex rel. Miller v. Internal Energy, Etc.,* 324 N.W.2d 707 (Iowa 1982), after reviewing *Marine Midland* and particularly its comments on a liberalized basis for disregarding the corporate defendant, had held that "allegations of fraud are sufficient in themselves under the less stringent test [established by *Marine Midland*] to disregard [the corporate defendant's] corporate existence and attribute its minimum contacts with [the forum state] to [the agent] on an individual basis. *Id.* at 714. It accordingly found the doctrine inapplicable in the case under review because the suit charged fraudulent representations.

*time Shipping Auth. v. Almogy,* 510 F.Supp. 873, 876 (S.D.N.Y.1981).

If the proper scope of the doctrine is one purely of statutory construction—if it is simply a rule of statutory construction where the statute concededly does not seek to go to the utmost limits of due process—it is without application in this case where service was had under the South Carolina long-arm statute, which, unlike the New York long-arm statute, extends the amenability of a non-resident to jurisdiction "to the outer perimeter allowed by due process." *O'Neal v. Hicks Brokerage Co.,* 537 F.2d 1266, 1268 (4th Cir.1976); *Triplett v. R.M. Wade & Co.,* 261 S.C. 419, 427–28, 200 S.E.2d 375, 378–79 (1973).[12] It is, therefore, unnecessary in this case to go through the normal two-step formula of examining first the validity of the service under the statute of the forum state (the only step taken in *Boas, Montreal Trust* and *Marine Midland* ). Our inquiry is limited to whether an exercise of jurisdiction over Pearson under the circumstances of this case is consistent with due process since the test of amenability under the state law and under the constitutional test are obviously identical here.[13] It is accordingly proper in this case to proceed directly to the dispositive issue of whether the doctrine can be said to represent a due process qualification or limitation upon the effective use of the state's long-arm statute in this case.

### IV

In seeking to answer the dispositive question in this case, we must identify at the outset the due process requirements established by the Supreme Court for acquiring jurisdiction in a forum state over a non-res-

ident under a state long-arm statute. The Supreme Court has, in a line of cases beginning with *Internat. Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) formulated these due process standards which must be met in order to acquire such jurisdiction. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The test established under such standards requires sufficient "minimum contacts" of the non-resident with the forum state as " 'not [to] offend "traditional notions" of fair play and substantial justice,' " *Woodson, supra,* 444 U.S. at 291–92, 100 S.Ct. at 563–64, by providing a "sufficient connection between the [non-resident] defendant and the forum State to make it fair to require defense of the action in the forum," *Kulko, supra,* 436 U.S. at 91, 98 S.Ct. at 1696. This burden has been held to be satisfied when there has been "some act [related to the cause of action alleged] by which the [non-resident] defendant purposefully avails [himself] of the privilege of conducting activities within the forum State . . . ." *Hanson v. Denckla, supra,* 357 U.S. at 253, 78 S.Ct. at 1239. As 2 Moore's *Federal Practice,* § 4.41–1[3], pp. 4–477–79 (1983) has put it, "[m]ost courts have held that the commission of a single tortious act is a sufficient contact upon which to base the assertion of in personam jurisdiction."

---

**12.** A recent case of this Circuit illustrative of the application of this principle in the context where the state court has given the state long arm statute a different construction than that earlier adopted in federal courts in the state is *Cawley v. Bloch,* 544 F.Supp. 133 (D.Md.1982), where the court abandoned its position in the earlier case of *In Re Mid-Atlantic Toyota Antitrust Litigation,* 525 F.Supp. 1265 (D.Md.1981) and relies primarily on what the court found to be the adoption of the "fiduciary shield" doctrine as a proper construction of the Maryland long-arm statute. It accordingly proceeded to adopt what it perceived to be the Maryland

court's construction of its long-arm statute. *Umans v. P.W.P. Services, Inc.,* 50 Md.App. 414, 439 A.2d 21 (1982). Such a decision, based on the State's own construction of its long-arm statute, is different from a case such as that here where the issue is not one of state law but of federal constitutional law.

**13.** *See* Note, *Return to the Twilight Zone-Federal Long-Arm Jurisdiction and Amenability to Federal Rule of Civil Procedure 4(f) Bulge Service of Process: Sprow v. Hartford Insurance Co.,* 41 Ohio St.L.J. 685, 701, n. 127 (1980).

And this is particularly so where the "tortious act" arises out of a "contact which had substantial connection with that State" such as a contract for the sale of real estate in the forum state. *McGee v. International Ins. Co., supra,* 355 U.S. at 223, 78 S.Ct. at 201. In such a case the agent has availed himself of "the privilege of conducting activities within the forum State" and by that act he "has clear notice that [he] is subject to suit there . . . ." *Woodson, supra,* 444 U.S. at 297, 100 S.Ct. at 567. There is no distinction made in these cases of the role in which the defendant performed his tortious acts, whether for his personal benefit or for the benefit of an employer or third party; the controlling issue is simply whether the non-resident defendant, whatever role he may have occupied, had such "minimum contacts."

The existence of "minimal contacts" of the defendant Pearson with the forum State in this case is plain. He came to the forum State in order to negotiate a sale of real property located in that State. He conducted such negotiations over a period of time and in the course of those negotiations in the forum State allegedly made various representations which it is claimed by the plaintiff were fraudulent, and, on the basis of such fraudulent representations, induced the plaintiff to purchase such property of the Bank in a transaction consummated in the forum state. In so doing Pearson availed himself "of the privilege of conducting activities within the forum State" and rendered himself amenable to service of process under the long-arm statute of the forum state.

Thus, if we look to the Supreme Court decisions, it would seem indisputable that jurisdiction over Pearson in this case was validly acquired by service of process in Texas under the terms of the South Carolina long-arm statute unless it can be said that such jurisdiction is qualified on due process grounds by the "fiduciary shield" doctrine. There is, as we have already indicated, no language in any of the Supreme Court decisions dealing with the long-arm statutes that suggests the existence of any

such qualification. We must accordingly look elsewhere than in the decisions of the Supreme Court for a constitutional basis for attaching this doctrine as a limitation upon the use of a long-arm statute. In making such inquiry, we begin by recalling that at its inception as well as in what is generally regarded as the most authoritative exposition of the doctrine in *Marine Midland,* the doctrine is said to be an equitable principle developed in the construction of the state long-arm statute involved in those cases and is expressly declared not to be a declaration of constitutional requirements of due process.

## V.

Ordinarily, this declaration in *Marine Midland* that the doctrine is not of constitutional dimensions would seem dispositive of our problem. But a number of circuit and district court decisions have declared that the "fiduciary shield" doctrine is to be regarded as a "constitutional" principle based on due process under the Fourteenth Amendment. *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 92–3 (2d Cir.1975); *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 929 (6th Cir.1974); *Bulova Watch Co. v. K. Hattori & Co., supra,* 508 F.Supp. at 1348; *State ex rel. Miller v. Internal Energy, Etc., supra,* 324 N.W.2d at 711. None of these cases, though, offered any exposition of a rationale for classifying the doctrine as an integral part of due process under the Fourteenth Amendment.[14] The Court in *Marine Midland,* did attempt to justify the doctrine on grounds of "fairness" and "fairness" is often spoken of as the common description of due process. *Guas v. Guas,* 146 N.J.Super. 541, 370 A.2d 91, 94 (1977). Even though the Court in *Marine Midland* expressly disclaimed any purpose by its expression of either stating or justifying the doctrine as a constitutional due process principle, it may be argued that the fairness rationale therein stated would support a ruling that the doctrine is an integral part of due process in this context. But the problem is that the reasoning stated in *Marine Midland,* on which it rested the "fairness" standard is unsatisfactory as

**14.** *See Sponsler,* 35 Wash. & Lee L.Rev. *supra* at 361–62.

an exegesis of constitutional reasoning. And the Court in *Marine Midland* seemed to have realized this for it immediately added to this statement of "underpinnings" for the doctrine the caveat that the doctrine was "not a constitutional principle." 664 F.2d at 902, n. 3. Since, however, this is the only attempt at rationalization for the doctrine in the circuit court decisions stating the doctrine, it appears fair to assume that this was the only theory on which the doctrine was considered by those who, unlike *Marine Midland,* chose to classify it as a constitutional doctrine.

The reason or justification for the doctrine which the court declared in *Marine Midland* provided the "underpinnings" for the doctrine was "the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." [15] The court itself recognized, however, that there was a real contradiction in the rationale it had expounded for the "fiduciary shield" doctrine. Thus, after stating as the "undisputed" law that "an individual who commits a tort while acting in his capacity as a corporate officer or employee may be held personally liable," it conceded that "there is

a dichotomy [created by the doctrine] between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts." 664 F.2d at 902. That the "dichotomy" inherent in the application of the doctrine would create an "anomalous" result which would "defeat the purposes of the law creating substantive liability," if the courts were "to permit a corporate officer to shield himself from jurisdiction by means of the corporate entity, when he could not interpose the same shield as a defense against substantive liability" has been correctly pointed out and remarked on in *Donner v. Tams-Witmark Music Library, Inc.,* 480 F.Supp. 1229, 1234 (E.D.Pa.1979); *Merkel Assoc., Inc. v. Bellofram Corp.,* 437 F.Supp. 612, 619 (W.D.N.Y.1977).[16] The doctrine, realistically considered, would render a resident agent liable for his tort committed in his corporate role but would, in effect, by giving him immunity from service, provide the non-resident agent who has come into the state and committed a tort but then left the state with actual immunity from liability for his tort.[17] It does not appear logical or reasonable or even to comport with the legislative philos-

---

**15.** This reasoning had been anticipated in *Grove Press, Inc. v. Central Intelligence Agcy.,* 483 F.Supp. 132, 135 and 135–36, n. 3 (S.D.N.Y. 1980). In that case the Court said:

"The rule articulated in cases like *Unicon,* *[Management Corp. v. Koppers Co.],* ... [250 F.Supp. 850], reflects a policy that it is unfair to subject an individual to jurisdiction on account of an act from which his employer derived the primary benefit."

The Court, also, observed, as did *Marine Midland:*

"It is interesting to note, however, that a corporate officer remains liable for his own torts when even they are committed in his capacity as corporate officer [citing New York cases]. Thus the procedural law does not parallel the substantive law of torts in this respect." [250 F.Supp. 850].

**16.** In *Merkel,* the court said:

"The 'fiduciary shield' is, however, inappropriate where a corporate officer 'commits a tortious act within the state' within the purview of CPLR § 302(a)(2) [i.e., the New York

long-arm statute] [citing case]. If a foreign corporation sends an employee into New York State to deliver certain goods and the employee physically assaults and batters a citizen of New York State, certainly there is no question that New York could exercise jurisdiction over such an employee. Conceptually, there is no reason to treat a corporate officer differently because he commits a 'business tort' in New York."

In *Marine Midland,* this language of *Merkel* was said "except as tempered by the principles" in that case, to be "not the prevailing view." 664 F.2d at 902. However, as we later indicate, the language of *Merkel* will accord with the result in all the Circuit Court decisions which at the time purported to apply the doctrine.

**17.** Cf., *Donsco, Inc. v. Casper Corp., supra,* 587 F.2d at 606:

"A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when *he is the actual participant in the tort*" (Italics added).

ophy inherent in the long-arm statutory procedure itself to hold that one may be held liable substantively for a tort he commits in his fiduciary role *in* the forum state but the court of the forum state may not, under its long-arm statute, require him to appear and defend the suit arising out of that tort in the forum state.

The same reason that would find service without the state unfair in the case simply because the agent was acting solely for the benefit of his employer should equally find service unfair, it would also seem, even when accomplished fortuitously by personal service within the forum state. The non-resident agent who was served personally while visiting in the forum state for a tort committed by him in his corporate role in that state took this very position and invoked the fiduciary shield doctrine as a ground for voiding that service in *Oxman's Erwin Meat Co. v. Blacketer,* 86 Wis.2d 683, 273 N.W.2d 285, 289 (1979). In dismissing the contention, the court said:

"We believe it reasonable, just and consistent with traditional notions of fair play that Blacketer—whether or not he acted as a corporate officer—be subjected to suit in Wisconsin to enforce personal liability arising from an alleged tortious act he committed while personally present in the state.

"If Blacketer drove the corporation's car and had an automobile accident in Wisconsin injuring a Wisconsin citizen, there would be no question that Wisconsin could exercise jurisdiction over him. We see no reason for treating Blacketer differently when the cause of action in tort is based on an alleged misrepresentation."

We find the rationale enunciated in *Marine Midland,* irrespective of its merits as a justification for an equitable doctrine to be applied by a state in the construction of its own statute, plainly insufficient to support a decision that jurisdiction over a non-resident corporate agent who has in his fiduciary capacity committed a tort in a forum state may not be acquired under the forum

long-arm statute which is as broad as due process itself solely on constitutional due process grounds. That is not to say that the amenability of a non-resident corporate agent to long-arm service is always the same as that of his corporate employer. There are situations where the corporation may be amenable and the agent is not under sound due process reasoning. The circumstances under which the corporation may be amenable and the agent not are accurately illustrated in the decision of the court in *Idaho Potato Com'n. v. Washington Potato Com'n.,* 410 F.Supp. 171, 182 (D.Idaho 1976).

In *Idaho Potato,* the court distinguished between the situation where the non-resident agent had come into the forum state and committed there the alleged tort and that where the non-resident agent had never been in the state and had no causal connection within the state with the alleged tort. In the first situation, it would find clear amenability to jurisdiction under the forum's long-arm statute. It said:

"If Corporation A from State X sends Employee B into State Y to deliver certain products, and B crashes his delivery truck, injuring Resident C in State Y, then jurisdiction over both A and B exists in State Y. The result flows from the commission of a tortious act within the purview of State Y's long-arm statute." *Id.* at 182.

On the other hand, it would deny amenability to jurisdiction over an agent whose activities occurred without the forum state, though those activities may have had an effect in the forum state. In so doing it recognized the difference between the amenability of the corporate employer and the corporate agent. It found that it was proper under the principles of "fair play" and "substantial justice" "to hold that a corporation which engages in activities having [foreseeable] ramifications beyond the state in which it is physically present may have sufficient connection [or "contacts"] with a distant forum where the ramifications are felt" [18] but that "it is quite another matter to hold that an individual work-

---

**18.** *See* the language of the court in *Hanson v. Denckla,* 357 U.S. at 250–51, 78 S.Ct. at 1237– 38 and *Woodson, supra,* 444 U.S. at 297, 100 S.Ct. at 567.

ing for that same corporation, who has never been present in the distant forum with regard to a corporate transaction, [and has no reason to foresee responsibility in the forum state] has a similar connection [or "contacts"] with the distant forum." In essence, what the court in *Idaho Potato* held was that when the corporate agent has not committed a tort in the forum state his foreseeable "contacts" with that state are too tenuous to establish those "minimum contacts" essential for jurisdiction but that if the agent has come into the forum and while there has committed a tort, whether for his personal benefit or for the benefit of his employer he has thereby "purposefully avail[ed] [himself] of the laws of another state" and of the privilege of conducting activities within the forum state, it seems that his being called on to respond for his tort in the forum state is sufficiently foreseeable to sustain jurisdiction over him under the state long-arm statute. *Id.* at 182–83.

This distinction, as explicated in *Idaho Potato* is a very reasonable one and one which is consistent with due process reasoning in the context of determining the constitutionality of long-arm jurisdiction generally. In *Woodson,* the Supreme Court said that the "concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum . . . ." 444 U.S. at 291–92, 100 S.Ct. at 563–64. If the agent has never been in the forum state and has had no "causal connection" with the alleged tort and has no reason to foresee being made amenable to suit therein, it would be unfair to require him to come to such state to defend a tortious act not participated in by him in that state but

that same reasoning would not apply to a corporation carrying on an interstate business whose tortious conduct had had a harmful result in the state. However, where the agent has come into the state and has actually committed the tort which forms the gravamen of the cause of action within the state, it is not unfair to require him to defend in the exact forum state where he committed that tort and where he availed himself of the privileges of the state.[19] In the latter instance, there can be no due process violation in an exercise of jurisdiction over the non-resident agent by the forum state.

## VI

It is interesting that this rule on the scope of the fiduciary shield doctrine, as developed in *Idaho Potato,* would be consistent with most of the decisions in which the doctrine has been invoked as well as with those decisions which proceeded strictly along lines of constitutional analysis without reference to the fiduciary shield doctrine. Thus, the three federal courts of appeals decisions which are most often cited as illustrative of the application of the doctrine as a constitutional principle would fit comfortably within the *ratio decidendi,* stated in *Idaho Potato, Lehigh Valley Industries, Inc. v. Birenbaum, supra,* 527 F.2d at 87; *Wilshire Oil Company of Texas v. Riffe,* 409 F.2d 1277 (10th Cir.1969); and *Weller v. Cromwell Oil Co., supra,* 504 F.2d at 927. Though all of them stated the doctrine, not a one of them can be said to have been decided under the expansive language of the doctrine and the decision in each was rested expressly upon the fact that the agent had not actually and individually participated in a tort in the forum state.[20] Thus, in *Lehigh Valley Industries,*

---

**19.** *See Graber v. Prelin Industries, Inc.,* 368 F.Supp. 1358, 1364 (D.S.D.1974), where the Court said in this connection that "if [the individual] defendants could afford to travel to various states for promotional meetings, they should be able to do so to defend suits brought against them" in those states.

**20.** In *Marine Midland* itself, the dismissal of the action under the fiduciary shield doctrine by the district court (as a matter of statutory construction and not constitutional principle) was

reversed, but the actual application of the doctrine in that case was somewhat obscure and the comment of the Court suggests that the actual result may have been thought applicable solely on the basis of the facts of the case (i.e., that the misrepresentation was "negligent" and not "fraudulent") for the Court said:

"In any event, given the rationale for the fiduciary shield doctrine, we think it obvious that the doctrine should be applied where the tort alleged is *negligent* misrepresentation

*Inc. v. Birenbaum,* the Court said, "[t]he issue before us is not whether plaintiffs might succeed on the merits of this claim but whether or not the tort occurred in New York." It then declared the individual agent in that case was immune from service under the New York long-arm statute because of plaintiffs' "failure . . . to establish any basis for finding that Norman [the agent] committed any tortious activity in New York . . . ." 527 F.2d at 92 and 94. It also responded to the contention of the plaintiffs that, while the tort may have been committed in Massachusetts, the result was injury to "person or property within [New York]" by saying that the long-arm statute in question required direct injury in the forum state and that "remote or consequential" damages would not suffice. 527 F.2d at 94. In *Wilshire Oil Company of Texas v. Riffe, supra,* 409 F.2d at 1281, the Court dismissed the action against the individual defendant because the plaintiff had "failed to prove a sufficient nexus between the submission of the bid [which was the sole contact of the agent with the forum state] and its claim against [the agent] Homer Riffe." [21] In *Weller v. Cromwell Oil Company, supra,* 504 F.2d at 929, the Court, while stating the fiduciary shield doctrine, rested its dismissal of the action against the individual defendants-agents on the fact that such defendants "were never in the state of Ohio to commit any act or omission."

The same basis of decision as reflected in these Courts of Appeals decisions is true generally, too, of the District Court cases in which the fiduciary shield doctrine has been spoken of as a constitutional rule. Thus, in *Bloom v. A.H. Pond Co., Inc.,* 519 F.Supp. 1162 (S.D.Fla.1981), the Court found no basis for long-arm jurisdiction because "there has been no nexus established between the individual defendants and this state" be-

yond "the fact that they are employed by a corporate defendant that is subject to jurisdiction for doing business in Florida." *Id.,* at 1170. Again, in *Techno Corp. v. Dahl Associates, Inc.,* 521 F.Supp. 1036 (W.D.Pa. 1981), the claim against the corporate officers was dismissed because all the relevant activities of such acts "were tortious acts committed outside Pennsylvania . . . ." *Id.,* at 1037. *See also, Kinstler v. Saturday Evening Post Co.,* 507 F.Supp. 113, 115 (S.C. N.Y.1981) (Even under the fiduciary shield doctrine, non-resident agent who commits a tort in the forum state must anticipate that "her activities [will be held to be such] that she should have foreseen consequences in this forum" and thus would be amenable to jurisdiction in the forum state); *Agra Chem. Dist. Co. v. Marion Laboratories, Inc.,* 523 F.Supp. 699, 703 (W.D.N.Y.1981) ("This fiduciary shield will not protect the [corporate] officer, [from amenability under the state long-arm statute] however, if he or she has committed a tortious act within the state"); *Knorr Brake Corp. v. Harbil, Inc.,* 550 F.Supp. 476, 479 (N.D.Ill.1982) ("Harbil encounters a like problem in claiming the individuals committed tortious acts in Illinois. Again it identifies no specific Illinois acts by specific individuals"); *Chancellor v. Lawrence,* 501 F.Supp. 997, 1003–05 (N.D.Ill.1980) (". . . if substantial justice and fundamental fairness is [sic] the standard, the Court cannot accept the conclusion that the mere fact that defendants' actions were taken in their corporate rather than individual capacities must alter the result . . . . defendants' conduct and connections to Illinois were such that they could reasonably anticipate being haled into court in Illinois in this action [citing *Woodson,* 444 U.S. at 297, 100 S.Ct. at 567]." p. 1005); and *Hyatt Intern. v. Inversiones Los Jabillos, C.A.,* 558 F.Supp. 932, 935 (N.D.Ill. 1982) (the tort did not arise from the de-

---

and the statements attributed to the corporate agent consisted of no more than confirmations and reiterations of the corporation's own statements" (Italics added). 664 F.2d at 902–03.

Even on that basis, the Court held that the district court should on remand consider whether, under its relaxed standard for disregarding the corporate shield, the defendant was

properly amenable to jurisdiction under the equitable principles attached by it to the New York long-arm statute.

**21.** That this is the limited scope of *Riffe* under Kansas law, *see Professional Investors Life Ins. Co. v. Roussel,* 445 F.Supp. 687, 696–98 (D.Kan.1978).

fendant's agent's activities within the state).[22]

## VII

Beyond that, the doctrine, confined as *Idaho Potato* did, would accord with the decisions in those jurisdictions which apparently have not accepted the "fiduciary shield" doctrine—at least, they have not cast their *ratio decidendi* in the terms of the doctrine. Typical of these decisions is *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902. There, the plaintiff, employed in a plant of the defendant Ortho in Puerto Rico, claimed to have sustained injuries as a result of negligent contamination in the plant environment. He sued Ortho, a New Jersey corporation, and its officers and directors, all residents of New Jersey, making service upon them under the Puerto Rico long-arm statute. The court dismissed the service upon the individual defendants because of the failure of the plaintiff to show any "direct personal involvement by the corporate officer in some decision or action which [was] causally related to plaintiff's injury" in Puerto Rico, *Id.*, at 907. At no point in its opinion did the court advert to the so-called "fiduciary shield" doctrine and it rested its decision, granting immunity from jurisdiction to the agents under the Puerto Rico long-arm statute, solely because of a lack of their personal involvement in the tortious activity in Puerto Rico.

In reaching this decision, the court in *Ortho* relied heavily on the fact that, as stated in 3A Fletcher Cyc. Corp. § 1137, p. 207 (1975), and in most decisions, that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort.[23] It seemed to equate amenability to long-arm jurisdiction with substantive liability in tort of the agent and thus avoided largely the "dichotomy" that disturbed the Court in *Marine Midland*. It said: "What is required is some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury." *Id.*, at 907. Such "direct personal involvement" typically existed, the Court said, "where the defendant [agent] was the 'guiding spirit' behind the wrongful conduct (citing case), or the 'central figure' in the challenged corporate activity (citing case)." *Id.*, at 902. Since the individual defendants were found to have had no "direct personal involvement" in any tort in Puerto Rico and thus no "contacts" within the *Woodson* rule between the forum jurisdiction and the individual defendants, there was no valid jurisdiction acquired over those defendants in the Puerto Rico court as a result of service under the Puerto Rico long-arm statute. *Ortho* is accordingly consistent with the rule declared in *Idaho Potato*.[24]

**22.** Illinois is second only to New York in the number of cases in which the "fiduciary shield" doctrine has been raised. In all of these Illinois cases, though, the real basis of decision is, not the bare language of the doctrine but the absence of any contacts of the individual agent in Illinois with the alleged tort. Thus, in *Hurletron v. Whittier, Inc. v. Barda*, 82 Ill.App.3d 443, 37 Ill.Dec. 838, 402 N.E.2d 840 (1980), the agent sued was relieved of amenability of service because it was found that he "had no meaningful contacts with Illinois" since his limited contacts had "no connection with the operative facts, . . . which gave rise to the claim . . . ." *Id.*, 37 Ill.Dec. at 841, 402 N.E.2d at 843. *Mergenthaler Linotype Co. v. Leonard Storch Enterprises*, 66 Ill.App.3d 789, 23 Ill.Dec. 352, 383 N.E.2d 1379 (1978) is similar. Storch, the officer in this case, was in Illinois on but two occasions and "the cause of action did not arise out of those two visits." *Id.*, 23 Ill.Dec. at 358, 383 N.E.2d at 1385. In *Green v. Advance Ross Electronics Corp.*, 86 Ill.2d 431, 56 Ill.Dec. 657,

427 N.E.2d 1203 (1981), the alleged "misconduct of [the corporate officer] took place outside Illinois" but it was the plaintiff's theory that "the consequences of his misconduct were felt in Illinois" and that, under the latter theory, the officer could be held subject to service under the Illinois long-arm statute. Proceeding under constitutional principles and not under the "fiduciary shield" doctrine, the court found that attempted long-arm jurisdiction over the officer who had not been in Illinois and whose alleged misconduct took place in Texas would offend due process. 56 Ill.Dec. at 662–63, 427 N.E.2d at 1207–08.

**23.** This rule was recently recognized by us in *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d at 1144. *See also Donsco, Inc. v. Casper Corp.*, 587 F.2d at 606.

**24.** *See also, Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 333 (5th Cir.1982), U.S. appeal pending.

The rule thus applied in *Ortho* is one that is easily understood and one which manifestly harmonizes the rule with reference to the substantive tort liability of a corporate agent and that with reference to his amenability to service in an action for tort under a state long-arm statute and removes the "dichotomy" that *Marine Midland* found disturbing in the application of the "fiduciary shield" doctrine. Under such a rule as was followed in *Ortho,* so long as the agent has not participated in the alleged tort in the forum state, he is immune from suit on such tort both under general corporate law and under the state long-arm statute but if he has a "direct personal involvement" in a tort committed in the forum state, the agent is subject to jurisdiction in that state under its long-arm statute.

## VIII

We do not mean to intimate that there are not district court decisions which may be said to be contrary to those cited by us. Illustrative of these are *Bulova Watch Co. Inc. v. Hattori & Co., Ltd., supra,* 508 F.Supp. 1322; *Fashion Two Twenty, Inc. v. Steinberg,* 339 F.Supp. 836, 841–42 (E.D.N. Y.1971); and *State Secur. Ins. Co. v. Frank B. Hall & Co., Inc.,* 530 F.Supp. 94 (N.D.Ill. 1981). However, many of those cases are not as clear as might be claimed. In *Bulova Watch,* for instance, there were four individual defendants. Two of them (Segal and Murphy) were said to have had "no personal contacts" with New York and a third (Waldman) was said to have been "only secondarily" involved. The only defendant who had had "minimum contacts" in New York with the alleged cause of action was the defendant Moriya, who was a Japanese resident. The court sustained for *equitable* reasons Moriya's motion to quash. These equitable considerations were stated by the court to be as follows (508 F.Supp. at 1349):

"He (Moriya) should be protected by the fiduciary shield doctrine from having to come half-way around the world to defend a case which will in any event be defended by the party on whose behalf his actions were allegedly taken. In the case of Moriya, the unique burdens that would be imposed on the defendant, and

our holding that the corporate employer is subject to our jurisdiction tip the balance decisively in favor of dismissal."

As we later indicate, our case presents no such equities in favor of the non-resident agent. Similarly, in *Steinberg,* it seems that "the harmful results of which plaintiff complains did not occur in New York." 339 F.Supp. at 842. *Hall, supra,* 530 F.Supp. 94, was decided on what it understood to be Illinois law, though it did note the due process issue which it incorrectly assumed to have been decided in *Bulova Watch.* All these cases suggest that almost uniformly the cases in which the "fiduciary shield" doctrine has been stated as a principle and applied have been cases in which the individual defendants had not committed a tort in the forum state or their acts had had no causal connection with the plaintiff's alleged cause of action or where, as in *Bulova Watch,* the court concluded that equitably the plaintiff was adequately protected by the presence of the agent's employer as a defendant, without imposing a "unique" hardship on the individual defendant by requiring him to travel "halfway around the world" to defend a personal suit, where the plaintiff could obtain full satisfaction in his action against the employer.

After canvassing the reasoning of the various courts which have sought to provide a reasoned analysis of the question, we are persuaded that when a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is coextensive with the full reach of due process.* On the other hand, if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and if any connection he had with the commission of the tort occurred without the forum state, we agree that, under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to support

jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state. In reaching this conclusion, we are influenced strongly by the consideration that this application of the rule of amenability to jurisdiction as adopted removes that contradiction or "dichotomy" perceived by *Marine Midland* "between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts." (664 F.2d at 902) Moreover, it follows more traditional lines of due process analysis.

■ It is obvious that, under the rule adopted by us, there is no question of the amenability of Pearson to the jurisdiction of the forum court in this case. To repeat: He committed the alleged tort within the forum state and it is unimportant in those circumstances whether he was acting at the time in his corporate or personal role. The result would be different had Pearson's connection with the tortious action been conducted without the forum state as was the situation in *Ortho.*

Under the facts of this particular case, we believe too that the "equitable" rule declared in *Marine Midland* and applied in *Bulova Watch* would support jurisdiction over Pearson. This is a "unique," if not bizarre, case. The corporate defendant is a national bank, which, under the often criticized "horse-and-buggy" section 94 of the National Bank Act,[25] is permitted to engage in lending on and owning real estate in South Carolina, but, unlike any other corporations or individuals, without any amenability to suit in the latter state. The bank in this case has invoked that right of immunity given it under section 94 and has been dismissed as a defendant. It has gone further by asking that its agent who personally committed the tort in his fiduciary role be given immunity from jurisdiction in a suit in South Carolina on account of his alleged tort in that State. In short, under its position which is sustained by Section 94, an out-of-state national bank can come into

a state, engage in business in that state and, in the course of such business, commit a tort through its agents sent into that state without being subject to any process in that state against it for that tortious activity. Under that theory, so far as jurisdiction of a South Carolina court for a tort committed by it in that State is concerned, the bank in this case is a "no-person," a mere name or corporate shell. This would seem to be a situation that fitted the situation contemplated by *Marine Midland* where it said that, if the corporate defendant was not responsive, the "fiduciary shield" doctrine could be disregarded. Certainly, this case presents that type of situation in which it would be inequitable to permit the bank and its agent to invoke the "corporate shield" doctrine as a defense against jurisdiction over the agent who had committed the tort. Moreover, it presents a situation different from *Bulova Watch,* where the court, treating the "fiduciary shield" doctrine as an equitable principle and balancing the equities of the parties, found that, because the agent's employer was amenable to jurisdiction and was responsive to judgment, the balance "tipped" in favor of the agent. In this case, equity balances against the agent's position, since the employer is immune from jurisdiction and the only tortfeasor amenable to the forum court's jurisdiction is the agent Pearson. Accordingly, even under the "fiduciary shield" doctrine as adumbrated in *Marine Midland,* and as applied in *Bulova Watch,* jurisdiction in the forum court over Pearson would exist in this case.

The judgment of the District Court dismissing the action against the defendant Pearson is reversed and the cause is remanded to the District Court for further proceedings consistent herewith.

REVERSED and REMANDED.

25. *Aetna Casualty & Surety Company v.* *Graves,* 381 F.Supp. 1159, 1161 (W.D.La.1974).